Next case will be 075153, Casitas Municipal Water v. United States. Thank you. Good morning, and may it please the court. Casitas has basically four points that we would like to touch on this morning, which reflect on the reversibility of the decision below. The first point is this, that paragraph 4 of the contract, which the court will find in the appendix at page 275, grants to Casitas a permanent and perpetual right to the use of all of the water of the Ventura River project. And for that reason, it was error to decide that the government's taking of 3,200 acre feet of that water for the use of the endangered fish was not a breach of that provision. The second point is that the Sovereign Act defense is inapplicable because there was not a proof of impossibility of performance. The third point, which may be mooted by the first, is that the taking cases, the taking jurisprudence of the Supreme Court and of this court in Washoe County v. United States are still good law post-Tahoe Sierra. Indeed, Washoe County is a post-Tahoe Sierra decision. And finally, that the cost of constructing a $9 million brand new fish diversion facility is in fact a construction cost and is not an operation and maintenance contract cost as the tribe court found. Mr. Miller, turning to the takings issue, I know that you and Ms. Barden have brought us again an interesting takings case. Let me ask you, your rights derive from the license, as I understand it, the California license, is that correct? Your use of property, your use right to the water derives, does it not, from the license, right? That is correct, Your Honor. Perhaps one way of putting it is that the state of California does have the authority to regulate the use of its water and it has granted that right to proceedings. And it's granted no such right to the United States. Now, the question I have, again, I'm sorry for jumping in on you, but we do have a little time. The question I have is, as I understand it, your contention as a factual matter is that you have the right to water pursuant to the license, and that you were required, however, to not use 3,200 acre feet per year. Is that correct? You were told. What I'm trying to think, what happened to that right? Was it actually diverted or sent downstream or what happened? Well, I'm happy to respond to that question, Your Honor. We've actually blown up the diagram which was part of the government expert report. It's found at Joint Appendix 1538 if you want to be able to have the copy in front of you. And I think it illustrates that point of what happened. First of all, keep in mind, of course, that the Ventura River is dry most of the year. When it rains, however, there is water in the river. That water is impounded behind… Counselor, I have a couple of questions. I don't understand factually. You say the Ventura River is dry most of the year. Does that mean there's no water that's actually flowing down through the Robles-Casistas Diversion Canal and into Lake Casistas during that time? That is correct, Your Honor. No water. So it's only 53 days a year that water even, approximately 53 days a year, that water even flows down this river and either gets diverted or goes over to the fish water or whatever? Yes, obviously that depends on the rainfall, Your Honor, but fundamentally that is correct. The river is dry most of the time. So the water then is captured behind Robles Dam in the Robles Forbidden, from which it is then released into the Casistas Diversion Canal, just as Your Honor suggested, and flows off about five miles into Casistas Lake, which is where it is impounded and stored for use by Casistas' 60,000 water customers. Now that's the way it was prior to the construction of the Fish Diversion Facility. The Fish Diversion Facility was constructed at a point as sort of a 90 degree turnoff from the canal. What happens now, we put a big red arrow to kind of show where the overshot gate is. The new operating criteria, under the biological opinion, ordered to be imposed by Casistas, ordered by the Bureau of Reclamation, the new criteria require the closure of this new overshot gate. What that does, you see, is to shut off the flow of water down the Casistas Canal and to back it up so that it then is diverted into the Fish Diversion Facility. On this chart, Mr. Rizzolo, what is the Fish Diversion Facility? Is it the thing that has a fish screen? What exactly is it? Is it the fish passage ladder?  Fundamentally, what that is, I think it is a fish water slide that allows the fish to swim both up and down around the dam. What is man-made? Is it concrete walls? It is, Your Honor. Man-made? This isn't just a portion of the pre-existing Ventura River? It is not a portion of the pre-existing river, that's correct, Your Honor. It is a man-made facility, and that sort of addresses the government's contention that this is merely a restriction on taking water out of the river. As you can see... If and when this case ends up in the Supreme Court, you may well want to include the photographs from the actual website, which are color, and really elucidate this much better than your diagram. I don't know if you can, given that they may not have been part of the record below, but they helped me to appreciate physically what was going on. Well, thank you, Your Honor. And I think that is our point, that this isn't a case involving the mere restriction of water being taken out of the river, but rather every gallon of water which goes down the Fish Diversion Facility is water that is taken out of the Casitas Canal, water that is subtracted from the water that goes into the Casitas Line for distribution. Counsel, assuming that we end up agreeing with you on this takings or on the breach of contract, either way, if we agree on the takings, this is only the issue of whether or not a regulatory takings analysis versus a per se takings analysis ought to apply. And as I understand it, the government is very clear below in suggesting that they are only for purposes of summary judgment, acknowledging a property right. Is that your understanding? So suppose we agree with you completely on the takings analysis. I then still have to remand this case back for the court to conduct further proceedings on the first prong of the takings analysis, namely the property interest. Well, I suppose we could work that out before the trial court, Your Honor. I'm not entirely clear that a party can concede a fact in order to get summary judgment, say there's no issue of fact on this point. I get summary judgment. But if I don't get summary judgment, then I didn't agree to that issue of fact. That being said, we'd be happy to and have riffed the issue several times to demonstrate that this particular water right is property under the law of the state of California. And I imagine there's also a need to remand for determination of compensation. Because as I understand it, the government had pointed out that Casitas does not actually use as much as they could in terms of water. So the 3200 actually may have no impact financially on them, given that in a given year they don't actually use all the water that they even have or could use. Is that right? So there would have to be a clear compensation determination by someone other than us. That is correct, Your Honor. Indeed, there are conflicting expert reports on that subject. And it's a complicated matter of determining climatic conditions, the climatic history, water use, and so forth and so on. There are differences, but even their experts said that there was some water loss. It is a factual issue that would have to be decided by the trial court. I want to make very clear, I understand again, I apologize for going back to what we've seen. Water's behind the Lowe's Dam. It enters the canal that would take it to the Casitas Reservoir. Correct. But before it gets out of the area of the dam, blocking action takes place, forcing a certain amount of it into the, what I'll call the fish ladder or the fish channel. Is that what happens? With a slight correction, Your Honor, it's while the water is in the canal. That's what that red area is about. It's left the pond behind the dam that's in the canal, but there's an intervention to force some of it back over at a right angle into the fish channel. Yes, think of it as a valve being closed on the canal. How frequently, I know the allegation is 3,200 acre feet per year, but on a temporal basis, does this happen once a month? How is it determined when this happens and how frequently does it happen? There is a complicated formula that deals with the quantity of rain, the amount of flow in the river, the amount of water that is in the forebay, and how much is flowing in the sequence canal level. So there's a time period, January through May, which is the time when the fish are migrating, that this applies. And you've now, I'm afraid, gotten the benefit of most of what I can tell you. Just what you're saying is that the frequency of this, we have an alleged overall yearly figure, but on a day-to-day basis, the frequency is subject to conditions in the river and so forth. Well, that's correct, and hydrologists customarily... That would answer my question. Yes, thank you, Ron. Now, as I said, we think this case could be disposed of on the contract, paragraph 4, which is, contrary to what the government said, not a mere recognition of the water right granted by the state, but is a promise by the United States that whatever the state does, the United States recognizes that all of the water made available through the construction and operation of the Ventura Project belongs to Pasitas. The United States has had no water to put into the fish diversion facility. They were faced with a problem. Where do we get the water? And their answer was, we change the operating criteria, so Pasitas has to give us the water. But counsel, why isn't the NMFS's issuance of the buyout opinion part of the Sovereign Act? The Sovereign Act defense, Your Honor, requires that the act that the government points to make performance impossible. It was not impossible for the government to perform this contract under any statute. Are you suggesting trapping and relocating? That would have been a possibility. Shouldn't you embrace this as an APA challenge? Your Honor, the APA challenge, of course, would only go to the question of whether the discretion granted by the Endangered Species Act was, in fact, reasonably exercised. For the mere fact that there is discretion, that the government had the discretion to either perform or not perform this contract, and chose an alternative under which they wouldn't perform, demonstrates that there is not the impossibility required for the Sovereign Act. But I seem to think that that still hinges on the notion that the only sovereign act is the Endangered Species Act proclamation, and not the issuance of the buyout, which told you how to deal with the Endangered Species Act. It seems to me if the issuance of the buyout was considered part of the Sovereign Act, then it removes your argument. There are two points to be made, perhaps, Your Honor. The first is, nothing in the Endangered Species Act required either Casitas or the Bureau of Reclamation to comply with the biological hand. It is just that. It is an opinion of the National Marine Fisheries Service with respect to what should be done, but it is not obligatory. There is no statutory requirement. The second point is that alternative performance was available to the United States here. Not only trucking and trapping, but there were different ways of constructing this facility. There were different ways of setting up the criteria so that not as much water would have been taken. All of those alternatives were available, and none of them were utilized in this case. The Carabetta decision, I think, demonstrates our point that where the agency is left with the legal ability to perform the contract, it can't say, I have a Sovereign Act defense, even if that performance is altered or is different. So the impossibility element simply does not exist here. We are not saying, by the way, that no government agency action can constitute a Sovereign Act. What we are saying is that the government has pointed to no statute and no agency action which was mandatory, which prohibited the recognition of Paragraph 4's perpetual right to the use of water. And then finally, I'll simply touch on the cost of construction of the fish ladder, approximately $9 million. The trial court held that that's an ordinary operation and maintenance expense relying on a 1925 decision in Nampa against the United States. That decision, of course, construed a statute and did not involve a contractual provision defining operation and maintenance and defining construction costs. This contract has a definition, and that definition is found in Article 9, Paragraph 9 of the contract. On page 285 of the appendix, that definition is very broad. It includes all of the construction costs associated with constructing this project. And let us keep in mind that the fundamental bargain struck here between Casitas and the United States was this. Casitas would pay $30.9 million in return for which they would get the water supply and they would operate this facility for no cost. The United States, in turn, would own the facility. It still owns it. And the United States would control it, would issue reasonable rules and regulations under Paragraph 7 of the contract. Casitas is robbed of that entire bargain when Casitas is told, you need to pay another $9 million to build a new facility that we've decided that we want to add to this project. And, of course, wants to provide for this water. All right, thank you. Thank you. Thank you. Thank you. May it please the court. What's at issue here is a restriction on the use of natural resource water in the river. How does a restriction of use mean they had to build a divergent dam? It's made of concrete. It's physical. No, the biological opinion said water had to remain in the stream. It would have been fine with us if they ran it through the radio gates. The extra water that is required under the biological opinion is not for the fish ladder. The fish ladder can operate under the amount of water that already was required to run downstream to meet other water rights downstream. The additional water is to maintain habitat downstream and allow the fish to get upstream, but it does not have to flow through the fish ladder. Now, the fact that Casitas designed the fish ladder and the way that the water would continue to get downstream, that is not part of the biological opinion. The government did not say how that had to happen. It is completely artificial to say that Casitas can choose to run the water around the dam rather than running it through the dam. It wouldn't be a physical thing if we ran it through the dam, but it would be if they choose to run it around, because once the situation is artificialized, for some reason maybe they figure it's easier to divert the remaining water over through the canal, while they also run some downstream. Nobody knows in the government, as far as I can tell, it's not in the record, why it was built that way. But the biological opinion takes that as an assumption, describes how that should operate so fish don't get trapped, but the biological opinion itself, all it cares about is maintaining flows in the water for the fish, keep water that would otherwise go downstream in the river, and that is a classic regulatory choice. The status quo when the Endangered Species Act designated the river trout, the status quo when the biological opinion issued was that water would not go downstream, that water would be diverted to the Casitas Lake. So it's not keep water that would have otherwise gone downstream, it's take water that would have otherwise gone to the Casitas Lake. It is a restriction of use of a resource, just as a restriction on if you have to leave your wetlands undeveloped, if you have to leave your coal that you've leased in the ground, if you have to leave trees for- In each of those cases, counsel, though, the property owners had other rights. In the coal cases, it was a combination of subsurface, support rights, surface rights, and in each one of the cases, the individuals had some collection of the lumber. Actually, Your Honor, that's not correct. Riff Energy is an example. They had a coal lease. All they had was a right to remove the coal, to mine the coal, and a traditional subsurface right in mineral leasing is a use of right. It is not a right of- A possessory right is a right to remove the coal. It's exactly the same kind of right. We made that point in our briefing. They have made no argument in response to that. But isn't it different to say you have to leave a portion of the coal there because of the concern for sinkage, and to say you have to divert a portion of the water you would have gotten? I mean, the status quo- This is just what bothers me about this case. The status quo at the time the biological opinion came out was all of that water was diverted to Casitas, and now they were forced to re-divert it back to- Casitas had a right to divert a certain amount of water. Sometimes now they will be able to divert less. It is not necessarily 3,200 acre-feet. We don't even know where that figure came from. But it is- At times they can divert less. At times they can divert more because the reservoir is full. The reservoir will go down more at times than it did before. Sometimes they couldn't divert a lot of the water they had a right to because the reservoir was full. It would go back down. But none of that is relevant to the diversion for the purposes of the fish ladder. The diversion for the purposes of protecting the endangered species that was identified- It is. It is separate and apart from all of those externalities that you're describing. The Supreme Court teaches in Tapos here that what's at issue is the character of the government action. The character of the government action here is to impose a passive restriction. Also, the only- When the government- This is not a case- There are two types of physical takes, so to speak. There's a physical invasion of a possessory or property right, which I think everybody agrees can't happen here. It's a use of right. There's no way for the government to sit on the use of right. Then there's a seizure or appropriation. And a characteristic of a seizure or appropriation is the government converts that to a governmental use, to its own use. Would you suggest it was different in this case, if instead of re-diverting water back down the Mentora River, the government came in with a giant truck, and the water was piped right into the government truck and then driven away for use by private homes? Would that be different? Yes, that would be different. That would be the allocated use to- The distinction between physical takes and regulatory takes in the Supreme Court case law does not always make a tremendous amount of sense from the point of view of the property right holder. But yes, that is exactly- That would be like the Gerlach and Dugan cases where the government said, You irrigators aren't going to get it anymore. We're going to build a dam and we're going to give it to these- So if the government had come in with a truck and taken the water away for some legitimate public use, public purpose, then that would amount to a taking. But if the government forces the redirection of water back down to the Mentora River, that's not a taking. It is water that is flowing in the river that is left in the river. Same with coal that is left in the ground that has to support houses over it. In fact, it is sort of dedicated to those people. They have to leave it in the ground. You could say it is redirected because before you thought they had a right to take it all. They bought a lease. Somebody said, you can have it all. And the government said, guess what? No, you can't. You have to leave some of it in there either because it's going to cause acid mine drainage or it has to support the above estate or whatever. The government in that sense redirected it. No, you were in the process of taking it out, but you have to leave it in the ground. Here it's the same thing. They're in the process of taking the water out of the river. And we say, no, you have to leave it in the river. Once it gets to where the government actually puts a bucket in the river and takes it and carries it to somebody else, that has the character, under Supreme Court case law, of a physical appropriation, of something that the government, in the case of the front dam, doesn't buy. So suppose the government said, you have to leave it in the river, and then two feet down the river they've got their truck with the pipes. No, I think if it's converted to a different, to a third-party use or the government's own use of some different type, it is the Supreme Court case law. So you don't think that this is the government's own use, the notion that we're protecting a dangerous species. Even though it's for the benefit of the public at large, the government has recognized that this is an important interest that needs to be protected, and you distinguish that as somehow different from a different use? It's the two things together. It is a restriction on the use of a resource, just like the wetlands or minerals or whatever, that in their current state provide a general public benefit. And the government regulates the use of that resource to maintain that public benefit. That is a classic, classic regulatory technique. What was the status quo physically of what it looked like the day before the biological opinion came out? Was all of this water being directed towards the Casitas lake? Actually, the day before the biological opinion came out, Casitas was already sending more water downstream. Because it complies with the endangered species. You understand what I'm saying. Before the government action, which ultimately caused them to have to direct more water down the Casitas River, prior to that occurring, was the status quo that all of the water was available and going to Casitas for its use? They could take all the water that they were allowed in their permit, and that they were physically capable of diverting through their... They can divert water through cubic feet per second. So the status quo prior to the government action that required the change in this case was Casitas' unmitigated right to water? Their right is actually a right to use. They don't have a property right in diversion. They have a right to use. It's an odd thing about this case. California law has recognized that the right to use water is a legitimate property right. Right, but they use 14,000 acre feet a year out of a 250,000 acre storage facility. So this issue of what they can take in and out is very far distant from the question of what... If the government said, you have to send water out of Casitas Lake that you normally give to irrigators, and so you send it to marine barracks, that's an appropriation. Nobody would be disputing that. But this is... Wait, you wouldn't be disputing if they had to... If instead Casitas couldn't send it to private farms but had to send it to marine barracks, you wouldn't be disputing that that's a taking. No, I'm making the distinction between... They don't have a right... They don't have a property right to water in the river. What they have is a use of product. They don't have a right to the physical water. And this water... There's just a restriction on how much they can divert. But that isn't... That actually doesn't take their property at that point. This is the critical inquiry for me. You seem to suggest it's a restriction on what they can divert, as though prior to the governmental action, all the water was simply flowing down the river the way all the coal was sitting underground. That simply wasn't the case. And so we have to look at the timing and the character of the government's action. In this case, it seems to me, that their arguing occurs where they are forced to now cease the diversion of water and redirect it back to the Ventura River. And that's something they have an expectation in developing their entire property, and they might have to cease doing it. How would the coal cases be different? For example, the party had already extracted the coal, and the government said, no, no, the land is starting to sink. Go put it back. That's kind of what it seems a little more like in this case, doesn't it? I mean, you've already taken the coal out. No, no, you've got to go put it back. Well, that actually would... I'm not sure. First of all, that would be requiring them to do something. Here, it's a passive restriction. Leave it alone. But that's not the case, because the status quo, you already agreed to it, and forgive me if I'm wrong, but didn't you agree that the status quo prior to the governmental action was the water was flowing? Because they had a right to take all that water. The water was flowing downstream. They had a right. But the same with the coal lease. Before the government poses a restriction, they have a right given to them by a private party and basic state law, perhaps, to remove all the coal. And then the government comes in with a regulatory program. Like the Surface Mining Act or something, and says, no, guess what? You don't get to take it all out. I mean, they had every expectation. I think this is a question about expectations. They had an expectation of making a diversion. We agree they had an expectation, but that doesn't turn it into a physical difference between now that a little more water flows downstream than used to. That is, the biological opinion only says, leave some more water in the river. Leave wetlands undeveloped. Leave your trees uncut. Leave your coal in the ground. Leave water in the river. Well, let me ask you. You mentioned earlier the Supreme Court cases are confusing. I share that. It is. You pick up one of these cases, and I read it, and you think, oh, I got the concept. And then you read another one, and it's going off in another direction. It is hard to, I agree, to get your hands around the jurisprudence precisely. But with that premise, I just have two questions. One, Mr. Marzullo described a physical activity, leaving aside all of the legal issues that we have to wrestle with in this case, your arguments, his arguments. Do you agree or disagree with what he physically said takes place? I believe he was correct. The way that Cassidis designed the fish passage facility, which really doesn't have anything to do with the taking thing, it's the water downstream. Because the fish passage facility, as I said, will work with the existing amount of water that was already running downstream. So there were sort of two requirements in the biological opinion. You have to improve the habitat downstream, and the river was basically dewatered. And you have to allow the, so that they're spawning marine habitat downstream can work. And then you have to allow them to get to their better habitat upstream. So you're saying that this, you're saying that this diversion here, I'm not using strictly diversion as a legal basis. I understand. You're saying that this physical diversion here only related to the ladder. Well, they do. They happen to also run the additional water, some of it through the ladder and some of it through an auxiliary pipe. OK. And they do take it out of their canal. But I mean, it can't be that a physical taking turns on the question of whether they ran it through the radio gates of the dam or decided that this was a better option. Let me ask the other question. You look at Judge Ruiz's opinion, and he was all set to, he would have hung his hat at theaters on his prior Tulare case, right? Yes. He was one. He looked like he would have ruled in on the takings issue in favor of Casitas based on his Tulare opinion. But then he made the determination. He said, no, no. Tulare is no longer good law in light of what the Supreme Court said in Tama, right? Right. And he ended up ruling in your favor. My question is this. You obviously think that he was correct in abandoning Tulare, right? Yes. Do you think he was correct in abandoning Tulare because of what the Supreme Court said in Tama, or do you think he was correct in abandoning Tulare for some other reason? He, that Tulare was wrong when it was decided. And the Supreme Court language in Tama just made clear the kinds of arguments that the government had made in Tulare, which is that this is just a use restriction. In fact, one of the problems in Tulare Do you think Tulare, in your view, made clear what was already an error in Tama, or did Tama make clear what was already an error in Tulare? Exactly. And what, in your view, is the critical error in Tulare? The critical error in Tulare, actually, Tulare took the physical invasion theory of Loretta and applied it to water rights, which the government cannot physically be on a usurpatory water right. But I think also what Tulare did was say the result seems the same as if the government had just taken the water for itself, rather than looking at the character of the governmental action. And that was the main flaw in Tulare. And that was where the Supreme Court in Tama, Sierra, said, look, these are two extremely different types of action. The physical take is rare. It is uncommon. It is typically obvious. It is not something to be merged with regulatory takes. There is not a fine line between the two. And that's why cases like the International Paper and the Frank Dam cases, the government started out exercising eminent domain authority and knew it had to buy the rights. And then because there were some ancillary rights involved in those cases that we had some reasons to try to get, say we didn't have to pay for those, the government did. But it was obvious that the government was taking power in the International Paper and was moving water rights from one person to another. But a restriction on the use of natural resources is a classic regulatory take. This court has followed the teachings, at least consistently. I don't know if they were all after Tahoe or not, but where it has been repeatedly, you've had plaintiffs come into court trying to turn regulatory takes into physical takes in order to get an easier analysis. And the court has consistently rejected that, and especially in the endangered species context with CBER and Boise Cascade, and it did it also in the storms. So let's see, I guess the Sovereign Acts Doctrine, I would just like to say that it is in fact the case, as Judge Moore was saying, that the Sovereign Act carries all the way through to the Bureau's decision, the Bureau of Reclamation's decision to adopt the biological opinion. Because as Judge Reese correctly determined, the Endangered Species Act, all the actions that the agencies take as they are compelled to do under the Endangered Species Act are part of the Sovereign Act. And if you didn't look at it that way, then you would not achieve the goal of the Sovereign Act of having the Bureau be in the same position as a private party. Whereas Casitas, for example, if it did lose use of water and was sued by somebody, it would say, oh, the Sovereign Act prevented us. And nobody would look behind the Sovereign Act to say whether something else could be done, whether we could track fish or something. The government gets to be in that same position pursuant to the Sovereign Acts Doctrine. So that helps answer Article IV. We also know that Article IV doesn't give Casitas the right to all the water available. It gives them the right to use water. And that is the water that is stored in Casitas Dam. And it is 14,000 acre-feet a year. It's under their permit. They have 28,000 acre-feet per year. Nobody is contending here that they have not been able to deliver any of that water. They don't have a right to unlimited diversions under that provision. That's not what that provision is about. Thank you. Do you have any other questions? Thank you, Your Honor. I have just a few points. First of all, I would like to remind the court and the government of footnotes 1 and 6 in their brief in which they relinquish this argument, which counsel has raised again today. Oh, it was Casitas that designed this fish diversion facility. It was all voluntary. The government has conceded that it was not. Otherwise, we'd have a tribal issue of fact. And the court would have to reverse this case. Let me ask you just to respond to, I guess, ask you to apply to Ms. Barton's response to your description of what happened. I want to get the best fix I can. What is your view? What is the position at Casitas vis-a-vis how there was a diversion or a take? In other words, what your description of what the physical act was involved in taking. And you described very clearly on your main argument on the operation of the channel over the fish line. But Ms. Barton said in her argument that no, that was a ditch. There was more to it. Is there more to it than that? I think you need to listen to Ms. Barton's argument very, very carefully. What she said is that she doesn't find in the biological opinion a requirement for water to go into that concrete fish diversion facility so the fish can swim up there. We disagree with that. It isn't something Casitas made up and said, gee, we'd really like to put water in that. No, I'm asking you, though, what do you say Casitas did that amounted to a take? What the United States did. What physical acts constituted the effect of a take? The closing of the overshot gate, Your Honor, which shuts off the diversion facility, shuts off the water flow into the store. Those are the gates that come down, right? It's the one where the red arrow is pointing, Your Honor. It's in the diversion canal itself. It's a big gate that comes down and stops the water from flowing to Casitas Lake. It's a shut off. I'm sorry, Your Honor? Where does the water go? It then goes into the fish diversion facility. It backs up in the canal and flows into the fish diversion facility. Now, does any of it get back somehow into the Ventura River downstream? Eventually, the fish diversion facility does connect with the Ventura River. So you say, so the physical act here that forms the basis of the taking is the gate that comes down, forces water over into the fish diversion facility. The water is there, and some of it flows back into the Ventura River downstream. Is that? Yes. Instead of continuing in the canal to the reservoir. Yes, water which was already in the pipeline, which was already on its way to storage, would have made it to storage, but for the government's operation of this overshot gate to shut down and divert that water. And I would thank you, Your Honor. All rise. The honorable court is adjourned until Friday morning at 10 o'clock AM.